UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

J. FRANKIE JURKOWSKI and
AARON DONNY-CLARK,

           Plaintiffs,

     v.

CITY OF SEATTLE, et al.,

           Defendants.

C15-1155 TSZ

ORDER

THIS MATTER comes before the Court on defendants' motion for summary judgment, docket no. 66. Having reviewed all papers and other materials filed in support of, and in opposition to, the motion, the Court concludes that this matter may be decided without oral argument and enters the following order.

**<u>Background</u>**

The first day of May or "May Day" has long been associated with demonstrations, protests, and civic unrest. For the past several May Days in Seattle, peaceful marches during the mornings and afternoons have been followed by violent rallies staged at night by self-proclaimed anti-capitalists or anarchists. <u>See</u> Fowler Decl. at ¶ 4 (docket no. 73); Ex. D to Burns Decl. (docket no. 71-1 at 57). Consistent with this pattern, on May 1, 2015, two events involving thousands of individuals occurred without incident during daylight hours, but a crowd of roughly 700 people who gathered around 6:00 p.m. at

Seattle Central College and then marched, without a permit, through the streets of Capitol Hill eventually grew unruly.  *See* Ex. B to Fowler Decl. (docket no. 73-1 at 35-36); Noble Report at 8, Ex. B to Noble Decl. (docket no. 75-1 at 21).  Plaintiffs J. Frankie Jurkowski and Aaron Donny-Clark were injured during the course of their participation as "street medics" in the unsanctioned evening protest on May Day 2015.

In this action, plaintiffs have sued the City of Seattle and the following members of the Seattle Police Department ("SPD"):  (i) Assistant Police Chief Steve Wilske, who was the City-Wide Commander on May 1, 2015; (ii) Captain Chris Fowler, who was the Incident Commander; (iii) Lieutenant Marc Garth Green, who was the West Precinct Branch Director; (iv) Lieutenant (formerly Sergeant) Thomas Yoon, who was a member of the Special Weapons and Tactics ("SWAT") unit on May Day 2015; and (v) Sergeant Trent Bergmann, who was also assigned to the SWAT team.[1]  Force Investigation Report at 5, Ex. A to Davisson Decl. (docket no. 72-1 at 6); *see* Yoon Decl. at ¶ 3 (docket no. 78); Bergmann Decl. at ¶ 2 (docket no. 70).  Plaintiffs assert claims against all defendants under 42 U.S.C. § 1983 for alleged violations of their First, Fourth, and Fourteenth Amendment rights, and claims against the individual defendants for intentional infliction of emotional distress (outrage) and assault and battery.  *See* Am. Compl. (docket no. 43).  Defendants seek summary judgment in their favor and dismissal of all claims.

---

[1] Plaintiffs have dismissed with prejudice their claims against Sergeant Robert Brown, Sergeant Mark Grinstead, Officer Brian Rees, and SWAT Officer Kirk Waldorf.  Stip. & Order (docket no. 58).

The core issue in this case is the use of blast ball grenades.  A blast ball grenade has a standard military fuse, known as an M-201, A-1 fuse.  Burns Statement at 5, Ex. G to Burns Decl. (docket no. 71-1 at 138).  A blast ball ignites in two stages.  After the pin is pulled and the lever is released, phase one of the ignition process supplies just enough energy to eject the fuse and all metal components from the rubber grenade.  _See_ _id._



Approximately 1½ seconds later, during phase two, the rubber grenade will explode at its equator; the only pieces that fly with "any type of velocity" are the two halves of the grenade, which are made of "very pliable rubber."  _Id._  SPD uses two versions

Exs. E & H to Burns Decl. (docket no. 71-1).

of blast balls, one containing oleoresin capsicum ("OC") powder (the active ingredient in pepper spray) and one that merely produces a plume of smoke and is considered "inert."  _Id._

SPD personnel are trained to pitch blast balls at a target location (not at an individual) in a bowling-ball style, known as "low" deployment, unless they are able to articulate a "higher risk" basis for an overhead throw or "high" deployment.  _See_ Ex. E to Burns Decl. (docket no. 71-1 at 112); _see also_ Burns Statement at 7-8 & 10, Ex. G to Burns Decl. (docket no. 71-1 at 140-41, 143).  Blast balls are used to create separation between police officers and a crowd (for everyone's safety) and to promote and control movement of the crowd.  _See_ Burns Statement at 5-8, Ex. G to Burns Decl. (docket no. 71-1 at 138-41).

The parties in this matter dispute whether, at the time blast balls were used on May 1, 2015, the scene was violent and contentious or relatively peaceful and calm. According to Lt. Garth Green, the protest moved from the grounds of Seattle Central College onto E. Pine Street at around 6:50 p.m. Ex. B to Garth Green Decl. (docket no. 74-1). The marchers turned northbound on Broadway, went westbound on E. Roy Street, headed southbound on Harvard Avenue E., and then continued southbound on Broadway. _Id._ When the crowd approached the intersection of Broadway and E. John Street, protestors pulled down traffic barriers and pushed them, as well as trash cans, into the road to prevent the police from following them. _Id._ Rocks, wrenches, and at least one cone were thrown at officers. _Id._ As Lt. Garth Green, who was apparently on a bicycle, approached the intersection of Broadway and E. Howell Street, he heard a radio call asking for more units and indicating that an officer was injured. _Id._ He soon thereafter authorized the use of blast balls and OC spray. _Id._

The demonstration moved westbound on E. Pike Street, with individuals attempting to start fires near both Harvard Avenue E. and Summit Avenue. _Id._ Lt. Garth Green ordered bicycle units to set up a line at the intersection of Boren Avenue and Pike Street to keep protestors from heading downtown. _Id._ As the crowd proceeded northbound on Minor Avenue, bicycle officers moved, on Lt. Garth Green's instructions, to Olive Way and Melrose Avenue, to prevent demonstrators from getting onto the freeway. _Id._ While officers were moving into formation, a protestor lobbed an explosive device at them. _Id._ At least four officers reported being injured by explosives thrown by demonstrators. _See_ Noble Report at 19-21 (docket no. 75-1 at 32-34). Other individuals

threw objects.  <u>See</u> Ex. B to Garth Green Decl. (docket no. 74-1).  Sgt. Bergmann has

indicated that a glass bottle hit him on his helmet, shattered, and caused lacerations on his

arms and hands.  Bergmann Decl. at ¶ 4 & Ex. B (docket nos. 70 & 70-1).  Around this

time, the Incident Commander (Capt. Fowler) declared over the radio that the

demonstration had become a riot.  Ex. B to Garth Green Decl. (docket no. 74-1); Ex. A to

Yoon Decl. (docket no. 78-1).

       The bicycle line then began moving eastbound on E. Olive Way, with officers

deploying blast balls and telling protestors to "move back."  <u>See</u> Ex. F to Miller Decl.

(docket no. 67); Ex. 1 to Williams Decl. (docket no. 64).  This portion of the police

 response is what most of the videos submitted by the parties captured.  Although Lt. Garth Green and Lt. Yoon indicate that, as the police line pushed east, demonstrators continued to pelt officers with rocks

and pieces of broken cement blocks, <u>see</u> Ex. B to Garth Green Decl. (docket no. 74-1),

Ex. A to Yoon Decl. (docket no. 78-1), plaintiffs contend that the video recordings

1 contradict such reports. Because the Court must consider the evidence in the light most

2 favorable to plaintiffs, as the non-movants, the Court draws no conclusion concerning

3 whether the available footage taken on May 1, 2015, near the intersection of Olive Way

4 and Melrose Avenue, is or is not consistent with defendants' accounts of events.[2]

5      On May 1, 2015, Lt. Yoon and Sgt. Bergmann each deployed nine blast balls;

6 Lt. Yoon used five inert and four OC blast balls, and Sgt. Bergmann used five inert and

7 four OC blast balls. Force Investigation Report at 11, Ex. A to Davisson Decl. (docket

8 no. 72-1 at 12); _see_ Ex. A to Yoon Decl. (docket no. 78-1). Both officers have indicated

9 that they did not target people with the blast balls, but instead deployed the grenades

10 toward specific areas or spaces, and that their use of blast balls was not based on or

11 influenced by the speech, messages, or words of the demonstrators. Yoon Decl. at ¶ 3

12 (docket no. 78); Bergmann Decl. at ¶¶ 3 & 5 (docket no. 70). Sgt. Bergmann states that

13 he had to overhand lob (rather than underhand toss) some of the blast balls to get them

14 over the bicycles and bicycle officers in front of him, but when he did so, the blast balls

15 stayed low, bouncing on the ground just ahead of

16 the bicycle line, between the officers and the

17 protestors, which is consistent with his training.

18 Bergmann Decl. at ¶ 6. He is seen deploying a

19 blast ball in this manner in the video designated



20 ─────────────────────

21 [2] In addition, to the extent that protestors on E. Olive Way in the vicinity of Melrose or Bellevue Avenue or E. Howell Street, close to where Jurkowski was injured, had ceased assaulting the officers who were

22 present, the question of whether the continued use of blast balls was nevertheless reasonable is inherently factual and cannot be decided on summary judgment.

23

JUR_PL000233 at 0:10-0:16.  *See* Ex. F to Miller Decl. (docket no. 67).  In this video

(and in virtually every other recording submitted by the parties), police officers

repeatedly shout "move back" in unison, while advancing in formation away from the

freeway overpass and toward Capitol Hill.

In contrast to Lt. Yoon's and Sgt. Bergmann's detailed recitations of the manners

in which they used blast balls on the evening at issue, plaintiffs offer mere speculation

concerning who and what caused their injuries.  In her deposition, Jurkowski testified as

follows:

> **Q.   How did you know it was a blast ball that hit you?**
> A.   Because it exploded on me.
> **Q.   Did you hear it explode?**
> A.   I can't remember.  There was a lot of explosions happening all over.
> **Q.   How did you know it was a blast ball instead of a flash bang?**
> A.   I don't, I guess, know.
> **Q.   You said that something hit you -- another object hit you very
>       nearly after the first object did.**
> A.   Mm-hmm.
> **Q.   And did you learn what that was?**
> A.   I did actually learn what it was, because I went to -- I did learn what
>       it was.  It's a blue-tipped sponge.
> **Q.   How did you learn that?**
> A.   I went to City Council.
> . . . .
> **Q.   Did you see who deployed either object in your direction?**
> A.   No.

Jurkowski Dep. at 154:14-156:8, Ex. ZA to Miller Decl. (docket no. 67-2).  After being

injured, Jurkowski took refuge in a bar known as Montana, which is located at 1506

E. Olive Way.  *Id.* at 158:2-15.  She left a few minutes later and went to the home of a

friend who lived nearby; she did not seek medical treatment because she did not have

health insurance.  *Id.* at 159:17-161:8.  Jurkowski estimates that her injuries occurred

around 7:30 or 8:00 p.m. on May 1, 2015, and she never looked on the ground for the object or objects that struck her.  *Id.* at 168:16-23.

According to plaintiffs' counsel, the blast ball that allegedly injured Jurkowski explodes at 3:38 in the video designated Jurkowski 383.  *See* Plas.' Resp. at 8 n.9 (docket



no. 98).  As seen, however, in the adjacent still image captured from such video, the angle of the shot does not even provide a view of Jurkowski.  *See* Ex. 1 to Williams Decl. (docket no. 64).  Although a tremendous amount of video footage has been submitted by plaintiffs, no specific citation has been made to any recording of Jurkowski being hit by a blast ball or of a blast ball exploding in her vicinity.

Jurkowski has produced photographs of the injuries on the backs of her thighs.  *See* Exs. I, J, & K to Miller Decl. (docket no. 67-1). According to Seattle Police Officer Thomas Burns, who is a Certified Master Instructor for specialty impact munitions, chemical agents,

 

noise flash diversion devices, and electric control devices, these injuries do not appear to be blast-ball related, but rather are consistent with being struck by a specialty impact munition, for example a 40-mm bluenose round, an orangenose round (containing OC),

or a bean bag, with which Seattle patrol officers were <u>not</u> armed on May 1, 2015. <u>See</u> Burns Statement at 15, Ex. G to Burns Decl. (docket no. 71-1 at 148). No assertion has been made by plaintiffs that either Lt. Yoon or Sgt. Bergmann were armed with or deployed specialty impact munitions on May Day 2015.

Donny-Clark has also described being hit twice by objects during the melee on May 1, 2015. He testified as follows:

> **Q. Do you know what it was --**
> A. No.
> **Q. -- that hit you?**
> A. Because it hit me from behind.
> **Q. Where did it strike your body?**
> A. Around my Achilles tendon.
> **Q. Did you stop and look at what it was?**
> A. No.
> . . . .
> **Q. So what happened after this object hit you on the back of the Achilles tendon?**
> A. Then there was another explosion, and something else felt like it hit the back of my thigh.
> **Q. And did you see what that object was?**
> A. No.
> **Q. Did you see who threw that object?**
> A. No.
> **Q. Did you see the person who threw the object that hit you on the Achilles tendon?**
> A. No.



Donny-Clark Dep. at 151:9-154:21, Ex. S to Miller Decl. (docket no. 67-2). Donny-Clark did not see any piece of a blast ball after he was struck in the Achilles (calcaneal) tendon and hamstring areas, <u>*id.*</u> at 161:18-20, and he took only one photograph of his injury (bruising on the back of his thigh), which was designated as Exhibit 3 to his

deposition, _see id._ at 155:20-158:7 (docket no. 67-2).  Donny-Clark has disclaimed any

similar bruising on or near his Achilles tendon.  _See id._ at 158:8-10.

Although Donny-Clark does not assert any injury as a result of being struck in the

Achilles tendon, plaintiffs' counsel has focused on a video of something exploding at

Donny-Clark's feet, and has offered no footage of any object striking the back of Donny-

Clark's leg.  In the cited recording, Donny-Clark, who is wearing a black back pack and

tan camouflage pants, is seen running up the far side of the street.  He appears to run into

whatever explodes, seems undeterred by the explosion, and continues sprinting away.

  

Ex. 1 to Williams Decl. (docket no. 64) (Jurkowski 383 at ~ 3:41).  These scenes occur in

front of the Crumble & Flake Patisserie and Montana (the bar into which Jurkowski

retreated), which occupy a building on the west side of E. Olive Way, just north of

E. Howell Street.

Neither Lt. Yoon nor Sgt. Bergmann observed, or received a report of, anyone

being injured by a blast ball.  Yoon Decl. at ¶ 5 (docket no. 78); Bergmann Decl. at ¶ 6

(docket no. 70).  According to Officer Burns, in the fifteen years prior to 2015 during

which blast balls had been used, SPD had not received even one complaint of injury.  _See_

Burns Statement at 9, Ex. G to Burns Decl. (docket no. 71-1 at 142). Officer Burns operates a side business known as CRT Less Lethal Inc., which performs testing on various less-lethal munitions to assess their potential for injury. *See* *id.* at 8 (docket no. 71-1 at 141). In multiple tests, in a variety of scenarios, blast ball explosions have shown virtually no potential for serious injury. *See* *id.* at 8-9 (docket no. 71-1 at 141-42) (describing the use of ballistic gelatin, which simulates the eyes, partially covered with a material that simulates human skin, as well as volunteers who agreed to have blast balls exploded at their feet, with no negative effect). Plaintiffs have proffered no contrary test results or expert opinion.

**Discussion**

**A.      Standard for Summary Judgment**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Id.* at 255, 257. When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See* *Celotex*, 477 U.S. at 322 (Rule 56 "mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**B.** **State Law Claims**

    **1.** **Intentional Infliction of Emotional Distress (Outrage)**

In Washington, intentional infliction of emotional distress constitutes the same tort as outrage. *Kloepfel v. Bokor*, 149 Wn.2d 192, 193 n.1, 66 P.3d 630 (2003). Under Washington law, the elements of the tort of outrage are: (i) extreme and outrageous conduct; (ii) intentional or reckless infliction of emotional distress; and (iii) actual result to the plaintiff of severe emotional distress. *Id.* at 195; *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 261, 928 P.2d 1127 (1997). The claim must be predicated on conduct that is "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kloepfel*, 149 Wn.2d at 196; *Dombrosky*, 84 Wn. App. at 261. The tort of outrage does not encompass mere insults, indignities, threats, annoyances, or petty oppressions. *Kloepfel*, 149 Wn.2d at 196. A plaintiff is assumed to be "hardened to a certain degree of rough language, unkindness, and lack of consideration." *Id.* The question of whether particular conduct rises to the requisite level of outrageousness is "ordinarily a question of fact for the jury." *Dombrosky*, 84 Wn. App. at 261. The Court, however, may dismiss a claim if reasonable minds could not differ as to the conclusion that the alleged behavior was not sufficiently extreme. *Id.* at 261-62.

Plaintiffs' theory of outrage is that SPD officers launched grenades into a crowd of people who were acting lawfully and complying with police commands. No evidence supports this view of events. The demonstration that took place on the evening of May 1, 2015, was itself illegal because it made "use" of public places and streets without the requisite permit. Seattle Municipal Code ("SMC") 15.04.010(A); *see* SMC 15.02.048 (defining "use"); *see also* SMC 11.25.110 (regarding the use of streets and sidewalks for marches). Protestors were undisputedly occupying the street and blocking traffic, which is prohibited by state law and Seattle ordinance.[3] Moreover, virtually every video submitted by plaintiffs contradicts the notion that protestors were complying with police commands; rather, individuals can be seen standing in the way of the approaching police formation, yelling at officers, or attempting to record their activities.

In response to defendants' motion for summary judgment, plaintiffs also fail to offer any evidence that they actually suffered severe emotional distress. Plaintiffs have provided no non-speculative evidence that they were targeted or intentionally hit with blast balls. Rather, plaintiffs put themselves in harm's way. Each plaintiff had participated in at least one previous May Day protest, and they were both aware that the situation was inherently unsafe. *See* Donny-Clark Dep. at 108:10-17, 123:3-16, Ex. S to

---

[3] *See* RCW 46.61.250 ("Where sidewalks are provided it is unlawful for any pedestrian to walk or otherwise move along and upon an adjacent roadway."); SMC 11.40.280 ("No person shall willfully congregate with other persons or willfully cause other persons to congregate in any street or alley in such a manner as to interfere with, or obstruct traffic, or when so congregated, refuse to disperse upon being requested to do so by any peace officer."); *see also* SMC 11.40.100 ("No pedestrian shall cross the roadway between adjacent intersections at which traffic-control signals are in operation, except in a marked crosswalk."); SMC 11.40.140 ("No pedestrian shall cross an arterial street other than in a crosswalk . . . .").

1    Miller Decl. (docket no. 67-2); Jurkowski Dep. at 74:1-6, 90:3-95:1, Ex. ZA to Miller

2    Decl. (docket no. 67-2).  Indeed, the potential for injury was the reason that each plaintiff

3    undertook to serve as a "street medic" on the evening at issue.  Thus, neither plaintiff can

4    assert that they did not anticipate the May Day 2015 riot and resulting police response,[4]

5    and tellingly, neither plaintiff has submitted a declaration or testimony concerning any

6    severe emotional distress.  Defendants' motion for summary judgment is GRANTED as

7    to plaintiffs' outrage claim (Count 6 of the Amended Complaint).[5]

8        **2.    Assault and Battery**

9        In the civil context, an assault is an inchoate battery.  A battery involves the

10   intentional infliction of a harmful bodily contact.  _Garratt v. Dailey_, 46 Wn.2d 197, 200,

11   279 P.2d 1091 (1955).  To be liable for battery, the actor must intend to bring about the

12   harmful or offensive contact, as to which no valid consent was given and no privilege

13   attached.  _Id._ at 200-01.  An assault occurs when a victim is placed in apprehension of

14   imminent physical violence by the perpetrator's act and/or threat.  _See Brower v._

---

16   [4] The deployment of blast balls in this case is simply not within the realm of police conduct for which
     outrage claims have survived summary judgment motions.  _See_, _e.g._, _Seaman v. Karr_, 114 Wn. App. 665,

17   59 P.3d 701 (2002) (reversing a summary judgment dismissal of an outrage claim, which was premised
     on the mistaken execution of a search warrant, involving deployment of a "distraction device" (a flash-
     bang grenade) that shattered the sliding glass door and ignited the carpet, the pointing of machine guns at

18   the elderly plaintiffs, the painful handcuffing and other mistreatment of the innocent couple, and the
     refusal by SWAT team members to acknowledge that they were in the wrong apartment).

19   [5] In their motion, defendants contend that plaintiffs cannot maintain both a claim of outrage and a claim
     for assault and battery, citing _Rice v. Janovich_, 109 Wn.2d 48, 742 P.2d 1230 (1987).  Although _Rice_

20   holds that the trial court erred in instructing the jury on both assault and outrage because emotional
     distress damages are available for assault and instructing on both claims resulted in double recovery, _see_

21   _id._ at 62, _Rice_ does not indicate that a plaintiff must elect to pursue assault as opposed to outrage or that a
     plaintiff must choose between the two theories in advance of the jury instruction phase of the litigation.

22   Thus, contrary to defendants' representation, _Rice_ does not itself support dismissal of plaintiffs' outrage
     claim.

23

     ORDER - 14

*Ackerley*, 88 Wn. App. 87, 92, 943 P.2d 1141 (1997). In other words, an assault is an attempted battery or a threatened battery. It requires an intent to cause a harmful or offensive bodily contact or an intent to cause an imminent apprehension of such contact, accompanied with the apparent present ability to give effect to the attempted or threatened battery, as well as an actual imminent apprehension on the part of the victim. *Id.* at 92-93 (quoting *Howell v. Winters*, 58 Wn. 436, 438, 108 P. 1077 (1910), and citing Restatement (Second) of Torts § 21 (1965)).

Even if plaintiffs could show that Lt. Yoon and/or Sgt. Bergmann tossed the blast balls allegedly causing their injuries, plaintiffs have no evidence that either Lt. Yoon or Sgt. Bergmann, the only individual defendants named in plaintiffs' assault and battery claim, intended to hit anyone with, or place anyone in imminent apprehension of being struck by, such devices. Indeed, both Lt. Yoon and Sgt. Bergmann have indicated under oath that, consistent with their training, they did not target people, but rather deployed the blast balls into the spaces between officers and protestors, and the video evidence does not contradict, but instead corroborates, their sworn statements. Defendants' motion for summary judgment is GRANTED as to plaintiffs' assault and battery claim (Count 7 of the Amended Complaint).

## C.    **Federal Claims**

### 1.    **Fourteenth Amendment - Excessive Force**

The United States Supreme Court has made clear that "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." _Graham v. Connor_, 490 U.S. 386, 395 (1989) (emphasis in original). Plaintiffs contend that they were "seized" by the deployment of blast balls. _See_ Plas.' Resp. at 23-24 (docket no. 98). If true, plaintiffs may not pursue their excessive force claim under a substantive due process theory. _See Cnty. of Sacramento v. Lewis_, 523 U.S. 833, 842-44 (1998) (explaining that _Graham_ precludes a substantive due process analysis if the claim is "covered" by the Fourth Amendment, which applies to searches and seizures, the latter of which occurs when a governmental agent terminates the "freedom of movement _through means intentionally applied_" (emphasis in original)).

Even if plaintiffs could assert a Fourteenth Amendment claim, it would lack merit. In the context of allegedly abusive executive action, a substantive due process claim is established only by proof of "the most egregious official conduct" that "can be said to be 'arbitrary in the constitutional sense.'" _Id._ at 846. The applicable test is whether the level of executive abuse of power "shocks the conscience," which "is no calibrated yard stick," and might mean one thing in one setting and something else in another. _See id._ at 846-50. When "unforeseen circumstances demand an officer's instant judgment," as in a prison riot or sudden police chase, however, a "much higher standard of fault than deliberate indifference" must be shown because, on such occasions, law enforcement officers have "obligations that tend to tug against each other" -- they must attempt to restore and/or maintain order, while not exacerbating any turmoil, act decisively while exercising restraint, and make decisions "in haste, under pressure, and frequently without the luxury of a second chance." _Id._ at 852-53.

In *Lewis*, the Supreme Court held that, with respect to a police officer who caused the death of a passenger on a motorcycle being chased at high speed, deliberate or reckless indifference to life was insufficient for liability under a substantive due process theory, and that the element of "arbitrary conduct shocking to the conscience" required proof that the officer had "a purpose to cause harm unrelated to the legitimate object of arrest[ing]" the motorcyclist. *Id.* at 836, 854-55. The Ninth Circuit has interpreted *Lewis* to require the Court to consider, in determining the appropriate standard of culpability, whether the situation "allowed the state actors time to fully consider the potential consequences of their conduct." *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998). Because the May Day 2015 demonstration involved exigent circumstances, plaintiffs must meet the heightened standard envisioned in *Lewis*, and for the same reasons that the blast-ball deployment at issue fails to support a claim of outrage, it does not constitute a violation of substantive due process. Defendants' motion for summary judgment is GRANTED as to each plaintiff's Fourteenth Amendment claim, (Counts 2 and 4 of the Amended Complaint).

### 2. **Fourth Amendment - Excessive Force**

#### a. **Seizure**

The Fourth Amendment protects against only unreasonable searches or seizures. *See Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1259 (E.D. Wash. 2005) (citing *Lewis*, 523 U.S. at 843). No contention has been made that Jurkowski or Donny-Clark was subjected to a "search," and thus, to survive defendants' motion for summary judgment on the excessive force claim, plaintiffs must establish that they were "seized"

within the meaning of the Fourth Amendment. A person is "seized" by police when an officer, by means of physical force or show of authority, terminates or restrains the person's freedom of movement "through means intentionally applied." _E.g._, _Nelson v. City of Davis_, 685 F.3d 867, 875 (9th Cir. 2012). The Supreme Court has made clear that no seizure occurs, despite a display of authority by a pursuing police vehicle (with siren blaring and lights flashing), if the reason the suspect stops is his or her own loss of control and subsequent crash. _See Brower v. Cnty. of Inyo_, 489 U.S. 593, 597 (1989). Similarly, no seizure takes place if the brakes of a parked and unoccupied police car fail, and it pins against a wall a passerby, who just happens to be running away from constables attempting to execute an arrest warrant. _Id._ at 596. In sum, the Fourth Amendment does not cover unsuccessful attempts to seize. _See Lewis_, 523 U.S. at 845 n.7 ("Attempted seizures of a person are beyond the scope of the Fourth Amendment.").

In contrast, when a police cruiser pulls alongside a fleeing car and sideswipes it, the resulting termination of the chase and restriction of the absconder's movement constitutes a seizure. _Brower_, 489 U.S. at 597. Likewise, when law enforcement set up a roadblock, as was the situation in _Brower_, to induce either a voluntary stop or a physical impact if the fugitive does not comply, and a collision indeed occurs, then a seizure has taken place. _Id._ at 598-99 ("It may well be that respondents here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the barrier, but we do not think it practicable to conduct such an inquiry into subjective intent. . . . We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.").

The reasoning of *Brower* has been applied to scenarios involving the use of "less-lethal" force. *See Nelson*, 685 F.3d at 875-78; *Logan*, 392 F. Supp. 2d at 1259-60. In *Nelson*, in an effort to disperse approximately 1,000 partygoers congregated at an apartment complex near the University of California at Davis, police fired pepperball guns, which shoot rounds containing OC powder at a velocity of 350 to 380 feet per second, at a group of individuals and struck the plaintiff in the eye, causing permanent injury. 685 F.3d at 872-74. The Ninth Circuit concluded that the plaintiff had been seized within the meaning of the Fourth Amendment because he and his fellow students were "the undifferentiated objects of shots intentionally fired" by officers, and his freedom of movement was thereby limited. *Id.* at 876-77. Rejecting the defendants' argument that their intent had been to hit the area around the partygoers, as opposed to the individuals, to douse them with OC powder, as well as to disperse the crowd, rather than to arrest or seize anyone, the *Nelson* Court observed that, regardless of the defendants' motives, they intentionally directed their use of force at the students and engaged in knowing and willful acts that terminated the plaintiff's freedom of movement. *Id.* at 877 ("the Fourth Amendment regulates conduct rather than thoughts" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011))).

In *Logan*, officers responded to the scene of a physical altercation between several members of two different fraternities. 392 F. Supp. 2d at 1255-56. When police arrived, the fighting was taking place on the first floor of the building, which housed a restaurant, while a related social function was ongoing in the nightclub on the second floor. *Id.* The officers sprayed OC toward the group of people who were kicking and punching each

other, stepped outside to let the OC take effect, and then reentered to make arrests and quell the situation. *Id.* at 1256. The OC immediately spread through the building and adversely affected individuals in the restaurant and on the dance floor who were not involved in the violence. *Id.* at 1256-57. The *Logan* Court concluded that the plaintiffs who were on the first floor and directly sprayed with OC were seized for purposes of their Fourth Amendment claims, but the plaintiffs who suffered secondary exposure were not seized and could pursue only substantive due process claims under the Fourteenth Amendment. *Id.* at 1260. The *Logan* Court reasoned that the defendants had intentionally sprayed the plaintiffs who had been fighting in an attempt to gain physical control over them, but the other plaintiffs present in the restaurant and nightclub were not the object of the defendants' use of OC and were therefore not "seized" within the meaning of the Fourth Amendment. *Id.*

In this case, the question of whether a seizure transpired is answered differently for each plaintiff. With respect to Donny-Clark, no showing has been made that the blast balls at issue impaired his freedom of movement. The video evidence proffered by plaintiffs show that, even after encountering what might have been a blast ball, Donny-Clark continued running up the street, and he was free to roam anywhere east of the police line that was attempting to keep people off the freeway and freeway overpasses. Thus, defendants' motion for summary judgment is GRANTED as to Donny-Clark's Fourth Amendment claim (Count 4 of the Amended Complaint).

With regard to Jurkowski, however, a question of fact exists as to whether her freedom of movement was restricted. As a result of her injury, Jurkowski was required to

seek refuge in a nearby bar and then to retreat to a friend's home; she was unable to

continue her participation in the demonstration.  Under the Ninth Circuit's reasoning in

_Nelson_, to the extent that Jurkowski was hit by a blast ball,[6] she was arguably "seized"

within the meaning of the Fourth Amendment.  Thus, the Court must consider whether

Jurkowski's alleged seizure was unreasonable.

### b.    Reasonableness

Generally, the question of whether an individual has been subjected to excessive

force requires a balancing of "the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake."

_Luchtel v. Hagemann_, 623 F.3d 975, 980 (9th Cir. 2010) (quoting _Graham_, 490 U.S. at

396).  The facts and circumstances of each particular case must be examined, including

"the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to

evade arrest by flight."  _Id._  Other considerations include the quantum of force used, the

availability of alternative methods of capturing or detaining the suspect, and the suspect's

mental and emotional state.  _Id._  The Court must evaluate "the totality of the

circumstances," judging the reasonableness of the particular use of force from the

perspective of a reasonable officer on the scene, not with "the 20/20 vision of hindsight,"

and bearing in mind that police officers need not use the least intrusive means available

---

[6] With respect to Jurkowski's claim that she was shot with a "blue-tipped sponge," plaintiffs appear to concede that no defendant named in this action fired such round.  _See_ Defs.' Motion at 12:8-9 (docket no. 66); Plas.' Resp. at 1-35 (docket no. 98) (containing no reference to "blue" or "sponge").

to them. _Id._ at 980, 982. Moreover, as recognized by the Eighth Circuit, "[w]hat is reasonable in the context of a potential large-scale urban riot" is different from what is reasonable in other, relatively calm, situations. _See Bernini v. City of St. Paul_, 665 F.3d 997, 1003 (8th Cir. 2012).

Defendants have made a strong showing that the deployment of blast balls on May Day 2015 was in response to violent behavior on the part of protestors and was for the purpose of moving the unruly crowd away from the freeway and freeway overpass. Nevertheless, although limited in their perspectives and not capturing all of the events at issue, the videos proffered by plaintiffs raise just enough doubt to preclude the Court from concluding, as a matter of law, that the use of force was reasonable. The Court must therefore turn to the question of causation.

### c.   **Integral Participant**

Plaintiffs concede that they are unsure of who caused their injuries. Plas.' Resp. at 24 (docket no. 98). Plaintiffs, however, attempt to link the blast balls that allegedly hit them to Lt. Yoon and/or Sgt. Bergmann by invoking the "integral participant" doctrine. Under an "integral participant" theory, an officer who was integral to an unconstitutional search may be held liable even though such officer's participation did not itself rise to the level of a constitutional violation. _See Boyd v. Benton Cnty._, 374 F.3d 773, 780 (9th Cir. 2004). For example, an officer who does not enter an apartment, but stands at the entryway, armed with a gun, while others engage in an unconstitutional search, can be viewed as an "integral participant" in the Fourth Amendment violation. _See id._; _see also_

*James ex rel. James v. Sadler*, 909 F.2d 834 (5th Cir. 1990); *Melear v. Spears*, 862 F.2d 1177 (5th Cir. 1989).

In *Boyd*, the Ninth Circuit concluded that all officers involved in the execution of a search warrant were integral participants with respect to one particular officer's deployment of a flash-bang grenade, which injured the plaintiff, who had been sleeping on the floor, near the front wall of the apartment. *Id.* at 777-80. Although the officers anticipated that five to eight people might be in the one-bedroom residence, only one of whom was a suspect in an earlier armed robbery, the flash-bang grenade was tossed through the front door, without looking, and without any warning to the occupants. *Id.* at 777-79. In rejecting a claim of qualified immunity, the *Boyd* Court reasoned that every officer was aware of, and did not object to, the decision to use a flash-bang grenade to gain entry and secure the premises, and they each stood armed behind the officer who deployed the flash-bang grenade and then meaningfully participated in the search operation. *Id.* at 780; *compare Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009) (holding that an officer who was not involved in the planning or execution of an unlawful warrantless search, but merely waited in the front yard, interviewing a witness, was entitled to qualified immunity).

Plaintiffs' attempt to apply the "integral participant" doctrine fails because they cannot identify any integral participant. Plaintiffs offer no non-speculative evidence linking their injuries to a blast ball, let alone to a blast ball deployed by SPD personnel. Instead, plaintiffs try to employ a quasi "res ipsa loquitur" theory, which the Ninth Circuit rejected in *Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002). *See id.* at 939

ORDER - 23

(Silverman, C.J., concurring).  In _Jones_, Los Angeles Police Department ("LAPD")

officers executed a search warrant at the plaintiff's home while she was not present; they

removed the plaintiff's son and two other men from the residence for a period of time to

secure the premises and begin the search, and then allowed the three men to sit on the

couch during the remainder of the search.  _Id._ at 933.  The plaintiff returned from work to

find her house in shambles, and she discovered the odor of urine emanating from her

iron.  _Id._ at 933-34.  The plaintiff complained to the LAPD about the search and then

filed suit under § 1983.  _Id._ at 933.

Although officers admitted to moving furniture, pictures, photographs, books,

clothes, automobile parts, and knickknacks, breaking a lock on a closet door, and

breaking the drawers of a dresser, none of them took responsibility for destroying the

living room or causing a urine smell in the plaintiff's iron.  _Id._ at 933-34.  After an

eight-day trial, a jury found in favor of the LAPD defendants.  _Id._ at 933.  The plaintiff

appealed, contending that the trial court erroneously refused to give jury instructions on

"integral participant" liability.[7]  _See id._ at 933-36.  The Ninth Circuit affirmed the district

---

[7] The plaintiff in _Jones_ proposed the following instructions:

> _Proposed Instruction 1_:  When a plaintiff cannot specifically state which defendant police officers engaged in an unreasonable search of a plaintiff's residence, but there is evidence to specify that certain defendants were among the police officers who were inside plaintiff's residence, and the officers agree they are among the officers who were present, the jury can reasonably infer that the named officers were participants in the alleged unlawful conduct.

> _Proposed Instruction 2_:  No matter whose actions ultimately inflicted the plaintiff's injury, when the deprivation of rights is the result of a team effort all members of the team may be held liable.

> _Proposed Instruction 3_:  An officer who is present until a search is completed and the seized items removed from the premises may be held liable under section 1983.  An

ORDER - 24

court's decision not to give the plaintiff's three proposed instructions, reasoning that "mere presence at a search or membership in a group, without personal involvement in and a causal connection to the unlawful act" is insufficient to establish liability under § 1983. *Id.* at 935-39; *see also* *Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996) (reversing and remanding for a new trial, holding that the trial court erred in instructing the jury that "when the deprivation of the rights is the result of a 'team effort,' all members of the 'team' may be held liable").

In his concurrence in *Jones*, Judge Silverman clarified that a "res ipsa-*type* instruction can be given . . . if: *first*, the defendants are uniquely positioned, to the exclusion of others, to know the circumstances that caused the plaintiff's injury; and *second*, the injury would not normally occur without wrong-doing on the defendants' part." 297 F.3d at 939 (Silverman, C.J., concurring) (emphasis in original, citing *Reber v. United States*, 951 F.2d 961, 964 n.1 (9th Cir. 1991)). Judge Silverman further observed that "[i]f government actors/defendants, due to circumstances of their own creation, prevent the plaintiff from identifying precisely which of them caused the plaintiff's injury, the jury can infer causation against those in exclusive control of the event." *Id.* He concluded that the instructions proposed by the plaintiff in *Jones* were

---

officer who remains armed on the premises throughout a search may be held liable under section 1983. An officer who guards a detainee outside while a search proceeds may be held liable under section 1983 because his activities are integral to the search and renders [sic] him a participant. An officer who provides backup may be held liable under section 1983.

297 F.3d at 935 & 938.

properly refused, not because they misstated the law, but because they were not supported by the evidence. *Id.*

As in *Jones*, the facts of this case do not support liability on a "res ipsa" style theory. SPD personnel were not in any better position than plaintiffs to know what caused their injuries, and their injuries could have been caused by individuals other than SPD officers and objects other than blast balls, for example, a specialty impact munition used by another law enforcement agency or an explosive thrown by a protestor. Under the reasoning of *Jones*, as well as *Chuman*, and in contrast to *Boyd*, plaintiffs' "integral participant" arguments lack merit. With respect to Donny-Clark, this conclusion is an alternative basis for dismissing his excessive force claim, and defendants' motion for summary judgment is GRANTED as to each plaintiff's Fourth Amendment claim (Counts 2 and 4 of the Amended Complaint). This analysis also provides further support for the dismissal of plaintiffs' assault and battery claim.

### 3. First Amendment

"[G]overnment officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express." *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014). The First Amendment does not, however, "leave people at liberty to publicize their views 'whenever and however and wherever they please.'" *Id.* To establish their First Amendment claims, plaintiffs must prove that (i) defendants, by their actions, "deterred or chilled" plaintiffs' political speech, and (ii) such deterrence was a "substantial or motivating factor" in defendants' conduct. *Mendocino Envtl. Ctr. v.*

*Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).  With respect to the first element, the inquiry is whether the alleged acts "would chill or silence a person of ordinary firmness from future First Amendment activities."  *Id.*  With regard to the second element, an intent to inhibit speech may be demonstrated through either direct or circumstantial evidence.  *Id.* at 1300-01.

Even assuming plaintiffs could establish that a person of ordinary firmness would be discouraged from engaging in future political speech by SPD's handling of the riot on May Day 2015, they offer no direct or circumstantial evidence that the deployment of blast balls was motivated by an improper animus.  Plaintiffs point to one officer's post-incident report allegedly describing the protest as "anti-police," *see* Plas.' Resp. at 31 (docket no. 98), but this officer is no longer a defendant, and no assertion can legitimately be made that any animus he might have had can be imputed to the individuals who remain defendants in this matter.  Moreover, the cited report does not reflect any preconceived hostility toward the protestors, but rather simply recounts the facts, including the crowd's chanting during the march of the slogans "f*** the police" and "all cops are bastards."  Ex. A to Brown Decl. (docket no. 80-1).

Similarly, plaintiffs complain about a photograph chosen for the title slide of a PowerPoint presentation for SPD's Chemical Agent Response Teams ("CART") certification class.  *See* Plas.' Resp. at 31 (docket no. 98).  According to plaintiffs, this photograph shows a group of "young black men beating up a white person."  *Id.*  Even if plaintiffs' interpretation of the photograph is accurate, they fail to show how the selection of this scene by the instructor, Officer Burns, who is not a defendant in this matter,

constitutes proof of an intent to inhibit speech on the part anyone who is a defendant.  In addition, when viewed in the context of the other images incorporated in the PowerPoint slides, which depict scenes of prior riots and the resulting damage, the instructor's message does not appear to be either racist or anti-speech, but rather anti-violence.  _See_ Ex. 57 to Williams Decl. (docket no. 64-1); _see also_ Ex. E to Burns Decl. (docket no. 71-1).[8]

Plaintiffs also attack Lt. Garth Green for calling the demonstrators "Black Lives Matter" protestors.  Plas.' Resp. at 31 (docket no. 98).  Plaintiffs take Lt. Garth Green's statement out of context.  In his report, Lt. Garth Green describes pre-event planning and indicates that he received a flyer from one of the organizers of a march regarding immigration issues that was scheduled to begin at Judkins Park.  Ex. B to Garth Green Decl. (docket no. 74-1).  Lt. Garth Green noted that this event had historically been "law abiding."  _Id._  The flyer indicated that, unlike in the past, the scheduled march would include "Black Lives Matter" and "other groups that were anti-police."  _Id._  Contrary to

---

[8] According to plaintiffs, Officer Burns "testified that, despite (or because of) the anti-police message of the demonstrators, he didn't 'even consider them protestors' when they were at Olive and Melrose." Plas.' Resp. at 32 (docket no. 98) (citing Ex. 108 at 3495).  The transcript proffered as Exhibit 108 does not contain a page 3495 or other pinpoint reference with such number, and an independent review of the document did not reveal the language that plaintiffs attribute to Officer Burns.  _See_ Ex. 108 to Williams Decl. (docket no. 64-2 at 13-18).  Plaintiffs also summarize Officer Burns's co-authored book as grouping medics among those with "hostile intentions."  Plas.' Resp. at 32 (docket no. 98).  Plaintiffs have misread what Officer Burns has written.  The book titled "Risk Management of Less Lethal Options: Evaluation, Deployment, Aftermath, and Forensics" contains two photographs, one labeled as "Figure 1.4  Protestor with gas mask and medical kit with possible hostile intentions" and the other as "Figure 1.5  Organized protest groups train their own medical teams to counteract police weapons."  Ex. 144 to Williams Decl. (docket no. 99 at 51).  Neither description accuses "medics" of having "hostile intentions."

plaintiffs' insinuation, Lt. Garth Green's report did not manifest any animus, but rather recounted information acquired from a handout circulated by event planners.

Plaintiffs further rely on an article published in _The Stranger_, titled "Amid Contract Negotiations, Seattle Police Union Claims It's 'Under Attack' by Black Lives Matter Activists," which was published on December 3, 2015, over seven months _after_ May Day 2015.  _See_ Plas.' Resp. at 31 & n.19 (docket no. 98).  Plaintiffs fail to explain how a news feature unrelated to, and published long after, the riot at issue constitutes evidence of the requisite intent to inhibit speech.

Finally, plaintiffs assert that animus is shown by an officer's suggestion to a protestor who was complaining about being "hit by one of those things" to "go home," and the officer's inquiry concerning whether such protestor needed medical assistance. _Id._ at 32 (citing Ex. 30 at 6:53-7:40 & Ex. 130 at 6:55-7:40).  Plaintiffs describe the officer's tone as sarcastic and taunting, but the recording does not support such editorializing.  Nothing about the exchange relates to speech or the exercise of First Amendment rights, and according to the time stamp on the video, it occurred around 8:05 p.m., after protestors had been allowed to march up and down the length of the Broadway district and after the demonstration had, according to police, turned into a riot. Plaintiffs have not shown the type of viewpoint-based discrimination or interference with peaceful expressive activity on which a First Amendment claim might be built, and defendants' motion for summary judgment is GRANTED as to each plaintiff's First Amendment claim (Counts 1 and 3 of the Amended Complaint).

## D.     **Supervisory and *Monell* Liability**

To the extent that Asst. Chief Wilske, Capt. Fowler, and Lt. Garth Green are being sued in their official capacities or in their supervisory capacities on a respondeat superior theory, the claims against them are duplicative of the claims against the City of Seattle and must be dismissed. *See Vance v. Cnty. of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996) ("if individuals are being sued in their official capacity as municipal officers *and* the municipal entity itself is also being sued, then the claims against the individuals are duplicative and should be dismissed" (emphasis in original)); *see also Johnson v. City of Berkeley*, 2016 WL 928723 at *3 (N.D. Cal. Mar. 11, 2016) (supervisory officials "may not be held liable under § 1983 for the unconstitutional actions of their subordinates based solely on a theory of respondeat superior").

On the other hand, a supervisor can be held individually liable for (i) setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, that he or she knew or reasonably should have known would cause others to inflict a constitutional injury; (ii) culpable action or inaction in the training, supervision, or control of subordinates; (iii) acquiescing in a constitutional deprivation by a subordinate; or (iv) conduct that shows a reckless or callous indifference to the rights of others. *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). Because plaintiffs have no cognizable First, Fourth, or Fourteenth Amendment claims, they have no basis for asserting that Asst. Chief Wilske, Capt. Fowler, or Lt. Garth Green set in motion, culpably acted or failed to act in a supervisory manner, acquiesced in, or exhibited reckless indifference as to any constitutional injury. Defendants' motion for summary

judgment is GRANTED as to plaintiffs' claims against Asst. Chief Wilske, Capt. Fowler, and Lt. Garth Green.

A municipality may not be held liable under § 1983 on a respondeat superior theory. _Monell v. Dep't of Soc. Servs. of N.Y.C._, 436 U.S. 658, 691 (1978); _see Ulrich v. City & Cnty. of San Francisco_, 308 F.3d 968, 984 (9th Cir. 2002). Instead, municipal liability must be premised on one of four theories: (i) a policy or longstanding practice or custom from which the alleged constitutional violation resulted; (ii) an unconstitutional action by an official with final policy-making authority; (iii) ratification by an official with final policy-making authority of a subordinate's unconstitutional conduct; or (iv) a failure to adequately train employees that amounts to deliberate indifference concerning the constitutional right at issue. _See Menotti v. City of Seattle_, 409 F.3d 1113, 1147 (9th Cir. 2005); _see also City of Canton v. Harris_, 489 U.S. 378 (1989). Plaintiffs pursue _Monell_ liability against the City of Seattle on only the first, policy or practice, principle. _See_ Plas.' Resp. at 34 (docket no. 98). Plaintiffs contend that SPD has an official policy or longstanding practice or custom of deploying blast ball grenades, without warning, at or in close proximity to peaceful protestors, medics, and media personnel. _Id._ (citing Exs. 30, 41, 43, 63, and 141).

None of the evidence on which plaintiffs rely supports the proposition that SPD has such policy, practice, or custom. Exhibit 30 is merely a video recording of an individual complaining about being "hit by one of those things" and stating, in response to an officer's suggestion that he go home, that he was trying to do so. Ex. 30 to Williams Decl. (docket no. 64). Exhibit 41 contains e-mails between Sergeant George

Davisson and Lt. Garth Green, in which Lt. Garth Green explains that no dispersal orders were given because protestors at Broadway and Howell ran off before the police line could get set up, officers at Melrose and Howell were "taking rocks and bottles so the crowd was moved for space," and at Seattle Central College, protestors started leaving on their own so a dispersal order was not needed. *See* Ex. 41 to Williams Decl. (docket no. 64 at 139). Exhibit 43 is a report by Sergeant Robert Brown, indicating that, after repeatedly commanding demonstrators to "move back," and observing a stick, two large bricks, chunks of cinderblock, and several rocks being thrown at the police formation, Sgt. Brown deployed an inert blast ball "into the crowd about 20 feet in front of our line," which had the desired effect of creating space between the officers and the protestors. *See* Ex. 43 to Williams Decl. (docket no. 64 at 144). None of these exhibits concerns a particular policy, practice, or custom of SPD.

Exhibit 63 is titled "After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri," *see* Ex. 63 to Williams Decl. (docket no. 64-1 at 86-93), and was stricken by Minute Order entered July 13, 2017, docket no. 106. Exhibit 141 contains excerpts of the transcript of the deposition of Sgt. Bergmann. *See* Ex. 141 to Williams Decl. (docket no. 99). Plaintiffs did not cite to any particular portion or page of the deposition transcript, and an independent review did not reveal any testimony indicating that SPD has an official policy or longstanding practice or custom of deploying blast ball grenades, without warning, at or in close proximity to peaceful protestors, medics, and media personnel.

The uncontroverted evidence leads to the contrary conclusion. As indicated by the CART instructor, Officer Burns, as well as the officers accused of throwing the injury-causing blast balls, Lt. Yoon and Sgt. Bergmann, SPD personnel are trained to pitch blast balls at a target location, not at an individual. *See* Ex. E to Burns Decl. (docket no. 71-1 at 112); Yoon Decl. at ¶ 3 (docket no. 78); Bergmann Decl. at ¶ 3 (docket no. 70); *see also* Burns Statement at 7-8 & 10, Ex. G to Burns Decl. (docket no. 71-1 at 140-41, 143). Moreover, in the various videos proffered by plaintiffs, officers can be heard clearly and repeatedly instructing demonstrators to "move back" prior to or in conjunction with the deployment of blast balls. Finally, no basis exists for believing that SPD has a policy, practice, or custom of using blast balls in connection with peaceful demonstrations, and plaintiffs' assertion to the contrary merely disputes SPD's view that the May Day 2015 protest had turned into a riot. Defendants' motion for summary judgment is GRANTED as to plaintiffs' *Monell* claim against the City of Seattle.

**Conclusion**

For the foregoing reasons, defendants' motion for summary judgment, docket no. 66, is GRANTED, and plaintiffs' claims are DISMISSED with prejudice. In light of its rulings, the Court need not and does not address the individual defendants' claims of qualified immunity.

The trial date of January 16, 2018, and all remaining dates and deadlines are STRICKEN.

The Clerk is DIRECTED to enter judgment consistent with this Order and to send a copy of such judgment and this Order to all counsel of record.

1       IT IS SO ORDERED.

2       DATED this 3rd day of October, 2017.

Thomas S. Zilly
United States District Judge